IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
                             EASTERN DIVISION

VICTOR SANTANA,                    )
                                   )
                 Plaintiff,        )
                                   )
     v.                            )     No.  09 C 5027
                                   )
COOK COUNTY BOARD OF REVIEW,       )
et al.,                            )
                                   )
                 Defendants.       )

                   <u>MEMORANDUM OPINION AND ORDER</u>

     Victor Santana ("Santana") filed this action against the

Cook County Board of Review ("Board") and its Commissioners Larry

Rogers ("Rogers"), Joseph Berrios ("Berrios") and Brendan

Houlihan ("Houlihan)(collectively "Commissioners") and against

Board employees Scott Guetzow ("Guetzow"), Thomas Jaconetty

("Jaconetty") and John Sullivan ("Sullivan")(collectively "Board

Employees"), seeking damages under 42 U.S.C. §1983 ("Section

1983") and the Racketeering Influenced and Corrupt Organizations

Act ("RICO," 18 U.S.C. §§1961-1968).[1]  This opinion addresses two

motions to dismiss Santana's Amended Complaint ("AC") pursuant to

Fed. R. Civ. P. ("Rule") 12(b)(6), the first by Rogers, Guetzow,

Houlihan and Sullivan and the second by Berrios, Jaconetty and

Board.[2]  For the following reasons, each motion is granted in

_____

       [1]  All further references to RICO's provisions will take the
     form "RICO §--," employing the Title 18 numbering but omitting
     the prefatory "18 U.S.C."

       [2]  For simplicity, the memorandum in support of that first
     motion will be cited simply "R. Mem. --," while the memorandum in

part and denied in part.

## Rule 12(b)(6) Standard

Under Rule 12(b)(6) a party may move for dismissal of a complaint on the ground of "failure to state a claim upon which relief can be granted." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 562-63 (2007) was the first case to repudiate, as overly broad, the half-century-old Rule 12(b)(6) formulation announced in Conley v. Gibson, 355 U.S. 41, 45-46 (1957) "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  And post-Twombly cases have further reshaped a new Rule 12(b)(6) standard.

First Twombly, 550 U.S. at 570 held that to survive a Rule 12(b)(6) motion a complaint must provide "only enough facts to state a claim to relief that is plausible on its face."  Or put otherwise, "[f]actual allegations must be enough to raise a right of relief above the speculative level" (id. at 555).  Then Erickson v. Pardus, 551 U.S. 89 (2007)(per curiam) and Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009) provided further Supreme Court enlightenment on the issue.

Before Iqbal our own Court of Appeals, in Airborne Beepers &

---

support of the second motion will be cited simply "B. Mem. --."
Santana's memorandum will be cited "S. Mem. --."

Video, Inc. v. AT&T Mobility LLC, 499 F.3d 663, 667 (7th Cir. 2007) described Twombly and Erickson as establishing "only that at some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8." And more recently Brooks v. Ross, 578 F.3d 574, 581 (7th Cir. 2009) has confirmed that the Airborne Beepers reading of pleading law post-Twombly and post-Erickson remains accurate after Iqbal. Brooks, id. describes Iqbal as "admonishing those plaintiffs who merely parrot the statutory language of the claims that they are pleading (something that anyone can do, regardless of what may be prompting the lawsuit), rather than providing some specific facts to ground those legal claims, that they must do more."

Familiar Rule 12(b)(6) principles--still operative under the new pleading regime--require the district court to accept as true all of Santana's well-pleaded factual allegations, with all reasonable inferences drawn in his favor (Christensen v. County of Boone, 483 F.3d 454, 457 (7th Cir. 2007)(per curiam)). What follows is therefore a summary of the facts as stated in the AC.

## Factual Background

Board's function is to review property tax assessments and, on a complaint by any taxpayer or on motion by any Board member, "revise, correct, alter, or modify any assessment" (35 ILCS 200/16-95). Rogers, Berrios and Houlihan fill the elected

position (35 ILCS 200/5-5) of Board Commissioners (AC ¶8), who preside over hearings on property tax adjustments.  Guetzow is employed as a Chief Deputy Commissioner and Jaconetty and Sullivan are employed as First Assistant Commissioners (AC ¶¶9-10)--neither of those positions is filled by election.

Santana previously worked at Board as an analyst, where he learned how Board's property tax review process works (AC ¶¶12-13).  Since he left Board employment in May 2002, he has worked as a consultant assisting taxpayers with property tax review paperwork (AC ¶¶14-15).  Many other nonlawyers and business entities also provide such assistance (AC ¶¶19-21).  Santana never assisted taxpayers on Board's premises, nor has he appeared before Board on a taxpayer's behalf (AC ¶¶16-18).

On May 4, 2009[3] Commissioners and Board Employees banned Santana from Board's premises--without giving him a reason, prior notice or opportunity for a hearing--and announced the ban through the news media (AC ¶¶23-28).  At some point in 2009 Rogers, Guetzow, Jaconetty and Sullivan sent letters by certified mail to several Cook County taxpayers, stating that the recipients must appear at hearings before Board on June 18 and 23 (AC ¶¶87(a) and (c)).  Although the letters were purportedly to advise the taxpayers of the possibility that they could face

---

[3]  All dates referred to after this point occurred in 2009 unless otherwise stated.

4

increased tax assessments, the actual reason for calling in the taxpayers was to question them about Santana (AC ¶¶87(a) and (c)). At the June 18 and 23 hearings Guetzow, Rogers and Sullivan did just that (AC ¶87(e)). Rogers, Guetzow and Sullivan also telephoned several Cook County taxpayers on the pretext of property-tax related Board business, but actually to question taxpayers about their association with Santana (AC ¶87(d)). Santana charges that conduct was improper and was outside the scope of Commissioners' and Board Employees' duties.

Finally, for a period of several years Commissioners have received numerous campaign donations from lawyers and law firms that appear before them at Board hearings (AC ¶¶29-30, 87(f)). Lawyers and law firms who made contributions to Commissioners experience higher success in obtaining tax reductions than do lawyers who did not make contributions (AC ¶87(f)). Santana did not contribute to Rogers' or Houlihan's recent campaign (AC ¶31).

### Affirmative Defenses

Board, Commissioners and Board Employees assert several affirmative defenses--including claims of absolute, qualified and Eleventh Amendment immunity--that call for threshold examination. This opinion turns to those that require more extended discussion.[4]

---

[4] Some other defenses can be addressed briefly. R. Mem. 13 challenges Santana's standing. But "[a]t the pleading stage, general factual allegations of injury resulting from the

Commissioners and Board Employees are wholly unpersuasive in claiming absolute immunity. Absolute immunity bars damages liability "[f]or officials whose special functions or constitutional status requires complete protection from suit" (<u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 807 (1982), quoted in <u>Mother Goose Nursery Sch., Inc. v. Sendak</u>, 770 F.2d 668, 671 (7th Cir. 1985)). Those concepts look to the nature of the official's responsibilities (<u>Tobin for Governor v. Ill. State Bd. of Elections</u>, 268 F.3d 517, 521 (7th Cir. 2001)). Immunity may apply to officials acting in a capacity that is either quasi-judicial (<u>id</u>.) or legislative (<u>Baird v. Bd. of Educ</u>., 389 F.3d 685, 696 (7th Cir. 2004))--but it does not extend to administrative conduct (<u>id</u>.).

R. Mem. 3 argues that the ban here was quasi-judicial, seeking to analogize this case to <u>Mireles v. Waco</u>, 502 U.S. 9, 11-12 (1991), which recognized immunity for a judge who ordered marshals to bring an attorney into his courtroom. But an administrative agency's effort to bar an individual from its

---

defendant's conduct may suffice" (<u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992)), so that Santana meets his burden by alleging that he suffered (and will suffer in the future) pecuniary and other harm due to the ban from Board's premises. Board also argues that Santana's Section 1983 claim against it should be dismissed because <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 694 (1978) permits Section 1983 liability for a government entity only when "execution of a government's policy or custom...inflicts the injury." But Board doesn't argue at this stage that Commissioners and Board Employees acted outside of Board policy.

premises is clearly not equivalent to a judge's control over the courtroom--a quintessentially judicial function, as the agency's action is not.[5]

R. Mem. 4 also contends that the ban was legislative, asserting that Santana was banned after a "hearing", "debat[e]" and "vot[e]." But that position fails to accept Santana's version of events as true (for he claims there was no hearing)--an acceptance that is required for affirmative defense purposes as well as on Rule 12(b)(6) motions. Moreover, the scope of legislative capacity is to be construed narrowly (Hansen v. Bennett, 948 F.2d 397, 402 (7th Cir. 1991)), and to characterize the ban here as legislative (even if done after a hearing) would be well beyond narrow construction. Indeed, this case is analogous to Hansen, id. at 400-01, where our Court of Appeals denied legislative immunity to a mayor who had removed the plaintiff from a city council meeting.

Commissioners and Board Employees also claim qualified immunity, which shields officials from damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known" (Harlow, 457 U.S. at 818). To defeat such asserted

---

[5] Commissioners arguably act in a quasi-judicial capacity when convening property tax assessment hearings, but only the AC's RICO claim (which this opinion later dismisses) implicated such hearings.

qualified immunity a plaintiff must show[6] both (1) the violation of a constitutional right and (2) that the right was "clearly established at the time of the defendant's misconduct" (concepts that the court may assess in either order)(Pearson v. Callahan, 129 S. Ct. 808, 815, 818 (2009)).

Although a meritorious qualified immunity defense should be granted early in the proceedings if possible (Purtell v. Mason, 527 F.3d 615, 621 (7th Cir. 2008)), such a result may be precluded at the pleading stage by differing factual accounts. Hence this opinion will address qualified immunity for each claim in turn after assessing the claims' Rule 12(b)(6) sufficiency.

Finally, Board asserts immunity under the Eleventh Amendment, which (despite its literal language) has been extended to bar federal jurisdiction over lawsuits against a state even by citizens of that same state (Papasan v. Allain, 478 U.S. 265, 276 (1986)). Although Eleventh Amendment protection does not extend to "counties and other similar municipal corporations" (Mt. Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977)), Board urges that it is an "arm of the state" rather than a Cook County agency. To that end it seeks to cloak itself in the

---

[6] "Show" should not be understood to require an evidentiary presentation as such. Instead this opinion, though using that and similar terminology employed in cited caselaw, has consistently complied with Rule 12(b)(6) principles by crediting Santana's allegations, measuring them of course against the Twombly-Iqbal "plausibility" yardstick.

8

mantle provided by <u>Scott v. O'Grady</u>, 975 F.2d 366, 370 (7th Cir. 1992), which concluded that a county sheriff acted as an arm of the state judicial system in executing an eviction judgment.

But the legal statuses of Board and of a county sheriff are not at all parallel.  It is true that Board reviews taxpayers' challenges to state real estate tax assessments (B. Mem. 2), and "[t]he establishment of procedures for the assessment of real estate tax has historically been a matter for the legislature," not within the County's home rule authority (<u>Chicago Bar Ass'n v. Cook County</u>, 124 Ill.App.3d 355, 360, 464 N.E.2d 728, 732 (1st Dist. 1984)).  But Santana responds by pointing to state law--the major determinant of whether a party acted as an arm of the state (<u>Scott</u>, 975 F.2d at 370)--that speaks of Board as a county agency.  Thus Commissioners must be "electors in the particular county," and Commissioners and Board Employees "receive compensation fixed by the county board, which shall be paid out of the county treasury" (35 ILCS 200/5-5(a); accord, <u>id</u>. at 200/5-15), factors that are important in assessing the nature of the entity (<u>Scott</u>, <u>id</u>. at 370).  Because Board's memorandum does not effectively rebut those indicia, or the inference that flows from them, this Court certainly cannot now determine as a matter of law that Board is entitled to Eleventh Amendment immunity.

## Sufficiency of Santana's Claims

Santana advances several claims for relief:  Section 1983

claims for deprivation of his rights under the Fourteenth and
First Amendments, a Section 1983 conspiracy claim and a civil
RICO claim. That last claim is dismissed for failure to state a
claim, while the rest survive.

First, Santana alleges that (1) banning him from Board's
premises without notice, hearing or justification and
(2) announcing that ban to the news media violated his Fourteenth
Amendment[7] due process rights (AC ¶¶35-36, 37, 39, 41). As to
any procedural due process claim, Santana must assert a plausible
(the <u>Twombly</u>-<u>Iqbal</u> teaching) deprivation of a protected property
or liberty interest without due process of law (<u>Brown v. City of
Michigan City</u>, 462 F.3d 720, 728 (7th Cir. 2006)).

On that score occupational liberty--the right to pursue
one's chosen employment--is a form of protected liberty (<u>Atwell
v. Lisle Park Dist.</u>, 286 F.3d 987, 993 (7th Cir. 2002)). And
although reputation alone is not a protected interest,
reputational harm plus "the alteration of a legal status"
(together, "stigma plus") implicate a protected liberty interest
(<u>Brown</u>, 462 F.3d at 729-30). As <u>McMahon v. Kindlarksi</u>, 512 F.3d
983, 988 (7th Cir. 2008)(internal quotation marks omitted)
recently put it, "stigma plus" involves harm to "good name,

_____

[7] Santana also alleges a Fifth Amendment violation, but
that fails as he asserts no federal government involvement. And
if Santana's counsel simply meant to invoke the Fifth Amendment's
Due Process Clause as AC Count I and ¶42 appear to indicate, the
Fourteenth Amendment alone--with its like clause--does the job.

reputation, honor or integrity in a way that made it virtually impossible...to find new employment in his chosen field."

Santana describes a stigma plus injury and a deprivation of occupational liberty in alleging that the ban and related media announcements "destroyed" his prospects of securing future work as a government consultant in Cook County, led to loss of a valuable contract and jeopardized his current employment (AC ¶¶58-60).[8]  B. Mem. 7-8 attempts to retort that Santana has no protected interest because his business involves the unauthorized practice of law under In re Yamaguchi, 118 Ill.2d 417, 426, 515 N.E.2d 1235, 1239 (1987).

But Yamaguchi is not at all determinative as a matter of law--to the contrary, Santana's conduct (advising and assisting taxpayers with Board appeals) is readily distinguishable from that proscribed in Yamaguchi (a non-attorney's completion and submission of appeal complaints on taxpayers' behalf).  Indeed, Illinois caselaw has allowed nonlawyer conduct that would appear to permit Santana's activity as an a fortiori matter--see, e.g., the discussion in Perto v. Bd. of Review, 274 Ill.App.3d 485, 493-96, 654 N.E.2d 232, 238-40 (2d Dist. 1995) and, most recently, Grafner v. Dep't of Employment Sec., 393 Ill.App.3d

---

[8]  Defendants' memoranda stress that Santana did not conduct his work on the Board premises, but it was the publicity and stigma following the ban that allegedly "destroyed" Santana's prospects.

791, 800-03, 914 N.E.2d 520, 528-30 (1st Dist. 2009).

Nor can qualified immunity for that claim be granted on the current record. Santana's assertion that the "alleged conduct sets out a constitutional violation" successfully alleges a due process violation. At the present pleading stage that suffices to satisfy one prong of the qualified immunity analysis. And as to the second prong, it is well established that "stigma plus" injuries and occupational liberty are protected under the Due Process Clause.

As for Santana's Count II claim, he alleges that Board, Commissioners, Board Employees and unnamed co-conspirators conspired to violate Section 1983 by agreeing to ban Santana and announcing the ban to the media, thus depriving him of a constitutionally protected liberty interest (AC ¶¶46-49). Such a Section 1983 conspiracy claim does not provide an "independent basis of liability"--it must rather be predicated on the deprivation of a constitutional right (Smith v. Gomez, 550 F.3d 613, 617 (7th Cir. 2008); Cefalu v. Village of Elk Grove, 211 F.3d 416, 423 (7th Cir. 2000)).

In part defendants respond by arguing that the intra-corporate conspiracy doctrine defeats Santana's Count II claim. That doctrine, of course, applies to Section 1985 claims (Payton v. Rush-Presbyterian-St. Luke's Med. Ctr., 184 F.3d 623, 632 (7th Cir. 1999)), and nothing suggests that it would not also apply to

an asserted conspiracy attacked under Section 1983.  S. Mem. 12-
13, headed "Plaintiff has adequately pled a conspiracy claim,"
fails to address that aspect of the attack on Count II at all.

This Court's consistent criticism of the nearly universal
practice of dividing up claims into counts based on different
theories of recovery,[9] as though the operative pleading units
were "causes of action" rather than "claims" (see, e.g., NAACP v.
Am. Family Mut. Ins. Co., 978 F.2d 287, 291-93 (7th Cir. 1992)),
is based in substantial part on the resulting tendency to fall
victim to the tyranny of labels.  Here both sides have gotten
hung up on the viability or nonviability of Santana's claim in
conspiracy terms, when the real issue is simply whether each of
several individuals has participated in the deprivation of any of
Santana's constitutional rights.  And if the answer is "yes" as
to any of the named individual defendants, his liability is not
diminished by his having acted in concert with other defendants
in doing so.

Hence this opinion looks at Count II in terms of its
substantive allegations, rather than whether those allegations
fit under the "conspiracy" rubric.  And in those terms Count II
survives as a constitutionally-based charge.  As already
discussed, Santana has successfully stated a claim for

_____

[9]  That practice is not within the literal terms of the Rule
10(b) language that identifies the circumstances under which
pleadings should employ separate counts.

deprivation of a protected liberty interest.  And because his allegations charge an agreement to deprive him of that protected liberty interest, qualified immunity is denied on the same rationale earlier stated for Santana's due process claim.

There is one respect in which Count II may pose a problem: its allegations' lack of specificity in collectivizing "defendants."  If a civil conspiracy as such were indeed the gravamen of the count, it would only have to "indicate the parties [to the conspiracy], general purpose, and approximate date" (<u>Walker v. Thompson</u>, 288 F.3d 1005, 1007 (7th Cir. 2002)), a threshold easily cleared by Santana.  But although the situation here might call for more precision as a pleading matter, the Count II incorporation by reference of AC ¶¶1-44 appears to inform defendants adequately:  In sum, AC Count II also survives.

Next, AC Count III asserts that the ban from Board's premises infringes Santana's First Amendment rights by limiting his future engagement in protected activities and by retaliating against him for past protected activities (AC ¶¶64-65; S. Mem. 8-9).  At a minimum, Santana states a claim that the ban infringes his right to petition the government for redress of grievances, which is a right that "extends to all departments of the Government" (<u>BE & K Constr. Co. v. NLRB</u>, 536 U.S. 516, 525 (2002)), including, of course, Board.  Consequently "efforts by

state actors to impede an individual's access to courts or
administrative agencies may provide the basis for a
constitutional claim under 42 U.S.C. §1983" (Vasquez v.
Hernandez, 60 F.3d 325, 328 (7th Cir. 1995)).  Santana (a Cook
County resident) reads the ban as covering Board's entire
premises, preventing him from appearing at a hearing even on his
own behalf (S. Mem. 9).  Board, Commissioners and Board Employees
suggest that the ban is not so broad, but this opinion must
accept Santana's factual account as true.  And in that respect,
Santana's characterization of the ban is plausible--the media
announcement of the ban makes sense if the ban is indeed wide in
scope.

     Santana also states a theory of First Amendment retaliation,
which consists of (1) a plaintiff's engagement in protected
activity, (2) adverse conduct against plaintiff by public
officials and (3) at least partial motivation of that adverse
conduct by plaintiff's protected activity (Bivens v. Trent, 591
F.3d 555, 559 (7th Cir. 2010)).  Santana alleges (1) that he
exercised his First Amendment rights in declining to contribute
to Rogers' and Houlihan's recent campaigns and (2) that the ban
was in retaliation for his refusal to contribute.

     As for qualified immunity regarding the Count III
contentions, both the right against retaliation and the right to
petition for redress of grievances were well established at the

time of defendants' alleged conduct.  Though the right against

retaliation is perhaps most familiar in the public employment

context, courts acknowledge that it may also arise in other

contexts (see, e.g. <u>Levy v. Pappas</u>, 510 F.3d 755, 762-63 (7th

Cir. 2007)).  And Santana satisfies the other element of the

qualified immunity analysis by stating a claim for a First

Amendment violation.

In AC Count IV Santana asserts that the ban violated his

Fourteenth Amendment equal protection rights under the "class-of-

one" theory, which calls for a showing of (1) intentional

differential treatment from others similarly situated (2) without

rational basis or resulting from illegitimate animus (<u>Schor v.

City of Chicago</u>, 576 F.3d 775, 779 (7th Cir. 2009)).  Santana

successfully states such a claim by alleging that--acting without

rational basis and with animus[10]--Board, Commissioners and Board

Employees "singl[ed] out [his] assistance to taxpayers as

---

[10]   R. Mem. 8 and B. Mem. 11 offer a rationalization for the
alleged conduct, but (1) even if that were to be credited it
would not insulate defendants from liability if Santana were to
prove the disjunctive alternative--the presence of an
illegitimate animus--and (2) although defendants' proffer might
impact Santana's ability to recover if he were unsuccessful in
showing animus in evidentiary terms, the proffer does not defeat
him at the pleading stage.  And as for the <u>Schor</u> alternative of
showing animus, B. Mem. 12 contends that Santana fails to allege
animus by Berrios and Jaconetty, but (1) no such allegation is
necessary where all of the defendants assertedly acted in concert
and (2) AC ¶74 does generally allege animus by all involved in
any event.

wrongful and distinguishable from others' identical conduct"[11]
and subsequently banned him from Board (AC ¶¶74-75).

B. Mem. 12 argues that relief is barred because selective
enforcement of the law is constitutionally permissible, citing
Falls v. Town of Dyer, 875 F.2d 146 (7th Cir. 1989).  But that is
no reason for dismissal, for Falls itself (id. at 149)
acknowledges that selective enforcement may constitute a class-
of-one violation in some cases.  Berrios, Jaconetty and Board
also contend that Avila v. Pappas, 591 F.3d 552 (7th Cir. 2010)
mandates dismissal, calling attention to its reliance on Engquist
v. Or. Dep't of Agric., 553 U.S. 591 (2008) for the proposition
that "class-of-one claims cannot rest on governmental activity
that is discretionary by design" (Avila, 591 F.3d at 554).  But
"by design" suggests a well-thought-out system of decisionmaking,
while on Santana's facts the decision to ban him was a one-time,
spontaneous occurrence, distinguishable from the public
employment decisionmaking in Engquist or the prosecutorial
decisionmaking in Avila.

So Santana has successfully pleaded a class-of-one equal
protection claim, establishing a constitutional violation for
qualified immunity purposes.  Class-of-one equal protection is a

---

[11]  B. Mem. 12 insists that Santana must identify a
comparator "prima facie identical [to him] in all relevant
respects" (Racine Charter One, Inc. v. Racine Unified Sch. Dist.,
424 F.3d 677, 680 (7th Cir. 2005)), but of course that is not
necessary at the pleading stage.

17

well-established concept, and although <u>Engquist</u> limited class-of-one relief in a specific context (public employment), it does not muddy the waters so that a reasonable person could not have anticipated class-of-one liability for the ban plus the media announcement.

Finally, AC Count V claims that Commissioners and Board employed Board as an "enterprise" to conduct racketeering activity in violation of RICO §1962. Such a claim must involve "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (<u>Sedima, S.P.R.L. v. Imrex Co.</u>, 473 U.S. 479, 496 (1985)). As <u>Tamayo v. Blagojevich</u>, 526 F.3d 1074, 1083 (7th Cir. 2008) observes, post-<u>Twombly</u> "a fuller set of factual allegations may be necessary to show that relief is plausible" in the RICO context.

Santana alleges several predicate acts of asserted racketeering activity: (1) mail and wire fraud (18 U.S.C. §§1341 and 1343) by Rogers, Guetzow and Sullivan; (2) intimidation and conspiracy to intimidate (720 ILCS 5/8-2 and 5/12-6(a)(6)) by Rogers, Guetzow, Sullivan and Jaconetty and (3) bribery and official misconduct (720 ILCS 5/33-1 and 5/33-3(c)) by Rogers, Berrios and Houlihan. Those contentions do not, however, survive analysis.

First, Santana's allegations of mail and wire fraud do not satisfy Rule 9(b), which requires that fraud allegations must be

described "with particularity."  To that end the AC must "state
the time, place, and content of the alleged false representa-
tions, the method by which the misrepresentations were
communicated, and the identities of the parties to those
misrepresentations" (<u>Slaney v. Int'l Amateur Athletic Fed'n</u>, 244
F.3d 580, 597 (7th Cir. 2001)), while here Santana has failed to
describe with particularity either the alleged misrepresentations
(referring only to "trick[ing] taxpayers") or the identities of
the misled parties (referring only to "taxpayers")(AC ¶¶87(a) and
(d)).[12]

Next, the alleged acts of intimidation and conspiracy to
intimidate are not, as a matter of law, predicate acts for RICO
purposes.  State offenses may constitute racketeering activity if
they "involv[e] murder, kidnapping, gambling, arson, robbery,
bribery, extortion, dealing in obscene matter, or dealing in a
controlled substance" (RICO §1961(1)).  Of the offenses in that
laundry list, only "extortion" is potentially involved in
defendants' alleged intimidation and conspiracy to intimidate.
And for a state "extortion" offense to serve as a predicate for a

---

[12]  More specifically, AC ¶87(d) alleges wire fraud
consisting of "contact[ing] numerous taxpayers in Cook County in
2009 [by telephone] in order to trick them into answering
questions about their associations with [Santana]."  Similarly,
AC ¶87(a) alleges wire and mail fraud consisting of "us[ing] the
wires and mail service to trick taxpayers into appearing before
[Board]...ostensibly to discuss taxes but [actually]...to answer
questions about [Santana]."

19

RICO violation, the offender has "to obtain or seek to obtain property" from the victim (Scheidler v. Nat'l Org. for Women, Inc., 537 U.S. 393, 410 (2003); see also Wilkie v. Robbins, 551 U.S. 537, 567 (2007)).  But in that respect Santana alleges only that Rogers, Guetzow, Sullivan and Jaconetty intimidated taxpayers for the purpose of obtaining information about Santana (AC ¶¶87(a) and (c))--not to obtain property.

That leaves only the alleged acts of bribery and official misconduct.[13]  But as R. Mem. 12-13 points out, Santana does not, as a matter of law, have standing to sue under RICO based on the alleged predicate acts of bribery and official misconduct.  RICO §1964(c) standing is conferred on "[a]ny person injured in his business or property by reason of a violation of section 1962," and that person must prove that the RICO violation has proximately caused injury (Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268 (1991)).  RWB Servs., LLC v. Hartford Computer Group, Inc., 539 F.3d 681, 687 (7th Cir. 2008)(internal citation omitted), recently observed that "[a]lthough the plaintiff still must allege an injury resulting from one of the predicate acts, courts must examine these acts in the context of the entire [RICO] 'violation' when assessing factual causation."[14]

_____

[13]  Although R. Mem. 12 contends otherwise, the alleged conduct clearly falls within the relevant Illinois criminal statutes.

[14]  That opinion appears to extend into the RICO §1962(c) context (with some qualifications) the holding in Beck v. Prupis,

As R. Mem. 12-13 argues, Santana's alleged injuries--the ban, media exposure and loss of business prospects--simply cannot be described as proximately resulting from the alleged acts of bribery and official misconduct. AC ¶87(f) does allege that the alleged bribery and misconduct caused injury to "non-contributing taxpayers and non-contributing lawyers," who fared worse at Board hearings than their counterparts who did make contributions to Commissioners' campaigns. But there is no arguable direct link between that harm and Santana's injury.

In sum, Santana's RICO claim must be dismissed. But, as stated earlier, his other claims survive.

## Conclusion

For the reasons set out in detail in this opinion, the motions to dismiss are granted as to Santana's RICO claim but denied as to all other claims. Defendants' contentions of absolute, qualified and Eleventh Amendment immunity are also denied. All defendants must answer the AC on or before April 19, 2010, and a status hearing is set for 9 a.m. April 23, 2010.

_____
Milton I. Shadur
Date:  March 30, 2010      Senior United States District Judge

_____

529 U.S. 494, 507 (2000) that, in claims for conspiracy to violate RICO under RICO §1962(d), the injury must stem from one of the racketeering acts itself.