IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VICTOR SANTANA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09 C 5027 |
| | ) | |
| COOK COUNTY BOARD OF REVIEW, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

<u>MEMORANDUM OPINION AND ORDER</u>[1]

In response to the proposal of plaintiff Victor Santana

("Santana") to file an amendment to replace his prior First

Amended Complaint ("FAC") with a Second Amended Complaint ("SAC")

---

[1] This Court had earlier contemplated the prospect that some further input from defense counsel might be needed for purposes of ruling on the subject dealt with here. But this Court's review of the parties' existing submissions appeared to confirm that nothing defense counsel might advance would change the conclusions reached here--and at the October 1 status hearing that this Court had set to discuss whether replies from defense counsel were needed to tee up the issues for resolution, counsel's responses were such as to support that appearance. As for the merits, for one thing this Court has of course been required to deal on a continuing basis with the <u>Twombly</u>-<u>Iqbal</u> canon and the caselaw developments that construe and apply what is taught there, and it is already well-equipped to address that subject without further submissions. And as for civil RICO itself, this Court has been active in that area since such claims first became the darling of plaintiffs' lawyers everywhere (some of this Court's early opinions were followed by our Court of Appeals in announcing doctrines that were ultimately confirmed by the Supreme Court). For a substantial period of time this Court was a regular speaker and panelist in civil RICO seminars and workshops, and it has continued to follow the subject closely ever since. In brief, the analysis set out in this opinion confirms that no further input from defense counsel could convert the metaphorical sows' ears that they have tendered into one or more equally metaphorical silk purses.

that repleads a civil RICO claim under 18 U.S.C. §1964(c) as its Count V, three sets of defendants have filed separate responses challenging the RICO claim. Santana's counsel has responded with a highly repetitive 31-page memorandum, apparently feeling the need to make the same points again and again--both out of seeming frustration and in the understandable desire to persuade this Court that defendants' attacks do not withstand analysis.

Santana's memorandum begins with a statement of facts drawn from the proposed Count V. Because it is a straightforward summary of the allegations there, a copy of that statement is attached as Ex. 1 to this opinion. It is to that statement that the requisite analysis must be applied.

To that end, whether or not this Court has guessed correctly as to the motivation for Santana's oversized memorandum, that memorandum has unquestionably been successful. It has demonstrated persuasively that defense counsel have to know better--or at least that they should. It is clear that defendants' positions have seriously mischaracterized the rules of federal pleading in general and the rules of civil RICO pleading in particular.

To begin with the latter, it is flat-out wrong for defense counsel to universalize RICO pleading as though it were fully governed by the standard of Fed. R. Civ. P. ("Rule") 9(b)--that is, as always requiring that the circumstances of defendants'

2

alleged wrongdoing be pleaded with particularity. To be sure, where the predicate acts that form the gravamen of a civil RICO claim are themselves fraudulent--say under the rubrics of mail fraud (18 U.S.C. §1341) or wire fraud (18 U.S.C. §1343)-- the more demanding standard of Rule 9(b) is brought into play. But where any of the predicate acts referred to in 18 U.S.C. §1961(1) are not themselves fraud-based charges (and there are plenty of those), the Supreme Court's unanimous decisions in Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168-69 (1993) and Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512-13 (2002) are still applicable to reject any requirement of a heightened fact pleading test for the sufficiency of a complaint's allegations (see, among the numerous cases confirming that proposition, Estate of Sims v. County of Bureau, 506 F.3d 509, 514 (7th Cir. 2007)).

Even where fraud charges are involved (whether under the RICO rubric or otherwise), one other aspect of the pleading requirements of Rule 9(b) bears mention. That has to do with the often-repeated newspaper-lead-paragraph approach first voiced in DiLeo v. Ernst & Young, 901 F.2d 624, 527 (7th Cir. 1990). That prescription really does not fit where the charged fraudulent conduct (whether RICO-violative or otherwise) is an entire pattern of activity over a period of time. DiLeo's formulation is not a one-size-fits-all pleading recipe. In situations such

3

as those alleged in the proposed Count V, heed must be given to
an important part of the Rule 9(b) language that is typically
given little attention:  its directive that what must be stated
with particularity are "the <u>circumstances</u> constituting fraud,"
rather than a laundry-list recital itemizing the particulars of
each individual fraudulent statement.  That "circumstances"
requirement is well satisfied by the type of allegations that are
set out in Count V, rather than the detailed evidentiary pleading
that defendants would demand.

Nor is the distortion of RICO pleading principles the only
attempted manipulation of doctrine on the part of defense
counsel.  They also engage in revisionist transmutation by
attempting to turn the <u>Twombly</u>-<u>Iqbal</u> pairing into a judicial
command to plead evidence.

That is a position our own Court of Appeals has been at
pains to reject on a repeated basis.  Indeed, to single out just
a few of its opinions such as the thoughtful discussion in
<u>Vincent v. City Colleges of Chicago</u>, 485 F.3d 919, 923-24 (7th
Cir. 2007)(issued just before <u>Twombly</u>) and the post-<u>Twombly</u>
expositions in <u>Tamayo v. Blagojevich</u>, 526 F.3d 1074, 1082-83 (7th
Cir. 2008) and <u>Bissessur v. Ind. Univ. Bd. of Trustees</u>, 581 F.3d
599, 602-03 (7th Cir. 2009), all of which Santana's counsel cite
in their memorandum, would seriously understate our Court of
Appeals' repeated emphasis on the principle that the <u>Twombly</u>-

4

Iqbal duo have not inaugurated an era of evidentiary pleading.

Accordingly, the defense motions targeting SAC Count V are denied. Defendants are ordered to answer all portions of the SAC that have not been covered by their previously-filed answers to the FAC on or before October 27, and the case is set for a next status hearing at 9 a.m. November 4, 2010.

_____
Milton I. Shadur
Senior United States District Judge

Date: October 6, 2010

5

**A.      Statement of Facts**

Taking the factual allegations in the Plaintiff's Second Amended Complaint ("Complaint") and in the Plaintiff's Proposed Amended Complaint to Replead RICO-Count V, ("PAC") in the light most favorable to Plaintiff, the following statements of fact are true:

The Cook County Board of Review ("Board of Review," "Board") hears appeals of the assessments of Cook County residents tax valuations.  Many residents choose to hire attorneys or property tax consultants to assist them in appealing their property tax assessments, or representing them before the Board of Review.  There are many non-lawyer consultants and businesses that assist Cook County residents file for real estate tax reductions at the Board of Review. Compliant 20.  Non-lawyer consultants, government agencies, accounting firms and businesses routinely tell Cook County property owners how to fill out the Board of Review's Complaint forms and initiate the process of filing for lower property taxes at the Board of Review.  Complaint at 21.  Plaintiff has had a real-estate tax consultancy business for almost nine years, wherein he has advised thousands of property owners in Cook County on real estate tax matters.  Complaint at 36.

Most of the campaign funds of the Defendant Commissioners consist of donations from lawyers and law firms whose livelihoods depend on the decisions of the Board of Review, and its Commissioners.  Complaint at 30.  Those attorneys typically are paid a percentage of the tax reductions they are able to secure their clients.  Complaint at 35.

The Board of Review has no consistently applied or set method for the adjudication of tax appeal claims, despite the existence of an Illinois law requiring specific and uniform standards be used. Complaint and PAC at 34 and 38.  Instead the Board has established and institutionalized a system of pay for play.  PAC at 37.  Real estate tax appeal lawyers that

EXHIBIT 1

contribute to the campaign funds and campaign committees of the Commissioners achieve better results for their clients than non-contributing lawyers and non-contributing taxpayers. Complaint at 37. This is because, quite simply, the Board (which does not have a uniform system to adjudicate appeals) adjudicates its appeals in part based upon the contribution levels of the attorney representing each client and property. PAC at 39. Therefore, files that were suspected to be associated with Plaintiff were segregated out, and treated unfairly. PAC at 40.

The members of the Board of Review, including the three Commissioners named in the instant Complaint, and the other individual defendants, employ the Board as a racketeering enterprise, in that they have institutionalized the aforementioned bribery and pay to play as the mandatory regime for the adjudication of real estate tax appeals in Cook County. PAC at 90. Inasmuch as the Board determines the value of properties, including commercial properties, it is an enterprise that has an enormous impact on interstate commerce, and is engaged in activities that affect interstate commerce. PAC at 91.

Defendants committed a series of Racketeering acts. Larry Rogers Jr., Joseph Berrios, Brendan Houlihan, committed bribery, under 720 ILCS 5/33-1(d) and 720 ILCS 5/33-1(e), inasmuch as certain dates (both specified and unspecified in the Complaint), he agreed (through various intermediaries on his staff, and personally) to accept campaign funds in exchange for property tax reductions from 4 attorneys, (who are representative of a trend). The four attorneys were identified by letters (Attorneys A-D) rather than by their legal names. PAC at 95-100. Nonetheless, they all are real people, known to the Plaintiff. Plaintiff fully anticipates that through discovery, the identities of these four (and other) attorneys will become known to all parties. However, Plaintiff's counsel does not think it is proper to place those names on the public record at this stage.

In part through these schemes, Larry Rogers Jr. accumulated close to one million dollars

2

in campaign contributions from real estate tax appeal attorneys that appear before him. PAC at 102. Much of those campaign contributions were used to pay Defendant Rogers' personal expenditures like meals, and shopping, so that Rogers would not have to report these voluminous expenditures on his submissions to the IRS. PAC at 102.

Similarly, Joseph Berrios accumulated close to three million dollars in campaign contributions from real estate tax appeal attorneys that appeared before him. Complaint at 101. Much of those campaign contributions were used to pay Defendant Berrios' personal expenditures like meals, and shopping, so that he would not have to report these voluminous expenditures on his submissions to the IRS. PAC at 101.

Larry Rogers Jr. also enlisted the help of Defendant Scott M. Guetzow in his illegal schemes. Guetzow and Rogers conspired with each other and others to devise and participate in a scheme, through the use of United States Mail, and interstate wire communications. Complaint at 103. Pursuant to that conspiracy, Rogers paid Guetzow an aggregate of $21,150.56 from the aforementioned campaign funds while he was ostensibly working as a full-time Cook County employee. Complaint at 103. He also paid William O'Shields for political consulting work also while O'Shields was ostensibly a full-time employee. PAC at 103.

Joseph Berrios enlisted the help of Thomas A. Jaconetty, in conspiring to commit various predicate acts. PAC at 104. Berrios and Jaconetty conspired with each other and others to devise and participate in a scheme, through the use of United States Mail, and interstate wire communications. PAC at 104. Pursuant to that conspiracy, Rogers paid Guetzow a sum of money from the aforementioned campaign funds while he was ostensibly working as a full-time Cook County employee. PAC at 104.

Of course, implicit in the scheme to accept contributions from tax attorneys in exchange for favorable rate reductions (thus benefiting the attorneys through their contingency agreements

3

with their clients) is the flip-side: attorneys and tax consultants, like Plaintiff Victor Santana, would not get such favorable results. This, of course, adversely affected their business. As plead in the Complaint, Victor Santana did *not* contribute to Defendants' campaigns. He paid the price for that omission.

Other attorneys did not withstand pressure and extortion. Attorneys A-D (once again, real people whose identities are known to Plaintiff, and whose identities can be pled in an amended complaint, if necessary) were extorted by Defendants Rogers, Berrios, and Houlihan who, through intermediaries and personally, made it known to those attorneys that their non-payment of large campaign contributions would affect their performance before the Board of Review. PAC at 105-107.

Defendant Berrios went further than the other Defendants in extorting services out of Plaintiff himself. He threatened Santana with fear of economic and reputational harm in exchange for procuring property and political consulting work from Santana for free. PAC at 109.

Defendants pattern of racketeering activity is not new. It has continued for the last decade, continues to the present, and will most likely continue into the future. PAC at 109. Defendants have hoped, through their actions, to subvert justice both to benefit their campaign coffers, and themselves personally. PAC at 110. While using their public offices to cloak their activities in a veil of legitimacy, Defendants have filled their campaign coffers, enriched their lifestyles and accumulated political power. PAC at 111. Defendants' created an almost pure pay to play system at the Cook County Board of Review. PAC at 112. Those who contributed the most could expect the highest reductions – which, of course, benefited the attorneys directly under their contingency agreements. PAC at 112. Those who did not contribute, like Plaintiff Victor Santana, by contrast, could not expect substantial justice to be reached. PAC at 112.

4

In Plaintiff's specific case, in retaliation for his refusal to pay in to the system, through political contributions, Plaintiff was scapegoated. PAC at 113. The Defendants used their nearly unchecked power, and the veil of legitimacy granted by public office, to ban the Plaintiff, publicly slander him, and make him a political scapegoat – destroying his business, property, reputation, and ability to make a living in Chicago. PAC at 114. Each of the Defendants agreed to join the conspiracy, to commit these predicate acts, and played some part in directing the enterprise's affairs. PAC at 115 and 116. Plaintiff's real estate tax consulting business was irrevocably harmed by the pay for play regime, and racketeering activities of the Defendants. PAC at 117. All of this was because Plaintiff refused to be complicit in the employment of Cook County Board of Review as an enterprise for illegal activity. PAC at 118.

**B. Pleading Standard**

Under Federal Rules of Civil Procedure ("F.R.C.P.") §15(a) courts should freely allow pleading amendments, "in the absence of any apparent or declared reason--such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." King v. Cooke, 26 F.3d 720 (7 Cir. 1994). Defendants do not claim that this Motion was unduly delayed, was brought in bad faith, or as a dilatory move, or that allowing the amendments would be prejudicial. They similarly do not suggest that Plaintiff has failed to cure deficiencies despite excessive amendments. Instead, Defendants suggest that the additional Counts, alleging violations of the Racketeering Act (RICO), do not state a claim. As such, Defendants Motion is best addressed like a Motion to Dismiss.[1]

---

[1] Incidentally, the Court set the matter for a short status specifically because it is anticipated that the Defendants will want to file a surreply to this reply. The Court specifically explained that a surreply would potentially be

5